**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

FLIGHT OPTIONS, LLC,          )    CASE NO. 1:16-CV-917
                          )
        Plaintiff,          )    MAGISTRATE JUDGE
                          )    JENNIFER DOWDELL ARMSTRONG
        v.               )
                          )
UNITED STATES OF AMERICA,  )    **OPINION AND ORDER**
                          )
        Defendant.      )

## I.    INTRODUCTION

Flight Options, LLC, and the United States of America ("Government") disagree about how fractional aircraft ownership programs were supposed to collect and remit federal excise taxes before March 31, 2012. Effective April 1, 2012, Congress amended the Internal Revenue Code to expressly exclude fractional ownership program operators from excise taxes under Section 4261. *See* 26 U.S.C. § 4261(j); P.L. 112-95, § 1103(c).

In this action, Flight Options seeks to (1) recover approximately $20 million in federal excise taxes that it says it overpaid between tax years 2009 and 2012 in connection with the fractional ownership programs it operated at the time; and (2) abate the unpaid federal excise tax that the Government has assessed on those programs for the same period.

The Government, through a counterclaim, seeks to recover the unpaid excise tax that it says was lawfully assessed on Flight Options for the period spanning from January 1, 2009, to March 31, 2012.

It appears that every other lawsuit and audit involving the Government and a fractional ownership program operator with respect to these excise tax issues has been resolved, either

1

through a final judgment or through settlement. The parties could not reach a resolution in this case.

The parties consented to a magistrate judge exercising jurisdiction over this case pursuant to 28 U.S.C. § 636(c), Rule 73 of the Federal Rules of Civil Procedure, and Local Rule 73.1. (ECF No. 89.)

The Court held a bench trial from September 23, 2024 to September 26, 2024. The parties thereafter submitted post-trial briefing on certain evidentiary issues, as well as proposed findings of fact and conclusions of law.

In this Opinion and Order, the Court sets forth the procedural history of the case, resolves the remaining evidentiary issues, and makes its findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. After considering all the evidence and for the reasons discussed below, the Court finds in favor of the Government and therefore enters judgment in its favor, as follows:

- The Court renders a judgment in favor of the Government on Flight Options' Complaint and therefore denies Flight Options' refund request.

- The Court renders a judgment in favor of the Government and against Flight Options on the Government's counterclaim, in the amount of $24,025,454.90, plus any interest and penalties (including failure to pay penalties) accruing after August 9, 2016.

## II.    PROCEDURAL HISTORY

Flight Options filed its Complaint on April 15, 2016. (ECF No. 1.) It sought a refund of $20,548,983.31 in federal excise tax that it collected from its customers and paid to the Internal Revenue Service for the tax years 2009 through 2011 and for the first tax quarter of 2012. (*Id.*) It also sought statutory interest under 26 U.S.C. § 6621. (*Id.*) Finally, Flight Options sought a ruling abating nearly $18 million in excise tax that the IRS had assessed but which Flight Options had

not paid, as well as failure-to-pay penalties of over $390,000 that the IRS had assessed on that alleged tax obligation. (*See id.*)

The Government filed a counterclaim on August 26, 2016, seeking to recover approximately $24 million in unpaid federal excise tax (including interest and penalties), plus any additional interest and penalties that would accrue during the pendency of the litigation. (ECF No. 20.)

The parties filed cross motions for summary judgment on July 17, 2020. (ECF Nos. 70, 71.) Each party filed opposition briefs (ECF Nos. 78, 79) and reply briefs (ECF Nos. 81, 82) in support of the summary judgment motion. The Court (specifically, the previous magistrate judge assigned to this matter) heard oral argument on the summary judgment motions on June 29, 2022. (*See* ECF non-document entry dated June 29, 2022.)

The previous magistrate judge recused himself from this matter for health reasons on August 9, 2023. (ECF No. 87.) On August 29, 2023, the parties consented to my jurisdiction. (ECF No. 89.)

On November 20, 2023, the Court entered its order denying both parties' motions for summary judgment. (ECF No. 90.) In doing so, the Court made several legal conclusions, including the following:

> **First,** Flight Options was providing "taxable transportation" subject to the federal excise tax as that term is used in the relevant provisions of the Internal Revenue Code.
>
> **Second,** the taxable "amounts paid" for such transportation include the monthly management and membership fees that Flight Options' customers paid to Flight Options.

The Court then concluded that two narrow issues remained for trial related to the applicability of the equitable defenses Flight Options had raised to liability:

> *First,* whether the IRS provided sufficiently clear guidance to Flight Options regarding its obligation to collect taxes on the monthly management and membership fees.

> *Second,* whether the IRS impermissibly discriminated against Flight Options vis-à-vis its competitors.

The Court conducted a bench trial on these issues from September 23, 2024 through September 26, 2024. (Transcripts, ECF Nos. 141–144, 147.) Flight Options offered the testimony of five witnesses; the parties jointly offered 23 exhibits and, separately, more than 80 exhibits, into evidence.[1] The parties rested their cases on September 26, 2024, subject to the admission of certain additional exhibits and while preserving (with each other's consent) the ability to make certain motions and evidentiary objections.

The Court held a post-trial hearing on October 15, 2024, at which (1) the parties stated their positions on certain evidentiary objections upon which the Court had reserved judgment during the trial and (2) Flight Options moved for a judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure. (Transcript, ECF No. 145.) The Court denied Flight Options' motion (*id.* at PageID# 5362) and resolved many of the evidentiary issues outstanding.

The parties thereafter submitted post-trial briefing setting forth proposed findings of fact and conclusions of law and further setting forth argument on the remaining evidentiary issues discussed below. (*See* ECF Nos. 148–155.)

This Opinion and Order follows. The Court begins with a brief summary of the narrow equitable defenses under consideration, then resolves the pending evidentiary issues, and finally sets forth the findings of fact and conclusions of law that ultimately led to the Court's judgment in favor of the Government.

---

[1] The Appendix to this Opinion identifies the evidence the Court considered in reaching its judgment in this matter.

## III.    BACKGROUND ON FLIGHT OPTIONS' EQUITABLE DEFENSES

### A.  Deputy Tax Collector Defense

In *Central Illinois Public Service Co. v. United States*, 435 U.S. 21 (1978), the Supreme Court determined that where an entity (there, an employer) "is in a secondary position as to liability for any tax of the employee, it is a matter of obvious concern that, absent further specific congressional action, the employer's obligation to withhold be precise and not speculative." *Id.* at 31–32. As the Court held, "[t]o require the employee to carry the risk of his own tax liability is not the same as to require the employer to carry the risk of the tax liability of its employee." *Id.* at 29.

Courts have interpreted this directive to require the IRS to provide a deputy tax collector with precise and non-speculative guidance of its collection obligations. *See General Elevator v. United States*, 20 Cl. Ct. 345, 353 (Cl. Ct. 1990) (holding that a deputy tax collector must have "adequate notice so that it will know what the IRS thinks the law is and therefore what actions they have to take"); *North Dakota State Univ. v. United States*, 255 F.3d 599, 608 (8th Cir. 2001) (stating that the deputy tax collector defense "protects an employer from liability for failing to withhold employment taxes from its employees when the employer lacks 'precise and not speculative' notice of its duty to withhold"); *University of Chicago v. United States*, 547 F.3d 773, 784 (7th Cir. 2008) (noting that the deputy tax collector defense "excuses an employer from withholding employment taxes from its employees unless the obligation to withhold was precise and not speculative") (quotation omitted); *Mcgraw-Hill, Inc. v. United States*, 623 F.2d 700, 705 (Ct. Cl. 1980).

It is Flight Options' burden to show that it did not have sufficient notice of its obligation to withhold. *See University of Chicago*, 547 F.3d at 784. The Court must thus consider whether Flight Options received precise and non-speculative guidance of its obligation to collect the Section 4261

tax on monthly management fees prior to the commencement of the tax periods at issue in this case.

### B.  Disparate Treatment Defense

"[A]s a general matter, similarly situated taxpayers should not be treated differently." *Sherwin-Williams Co. v. United States*, 403 F.3d 793, 797 (6th Cir. 2005). As Justice Frankfurter wrote in a concurring opinion in 1960:

> The Commissioner cannot tax one and not tax another without some rational basis for the difference. And so, assuming the correctness of the principle of "equality," it can be an independent ground of decision that the Commissioner has been inconsistent, without much concern for whether we should hold as an original matter that the position the Commissioner now seeks to sustain is wrong.

*United States v. Kaiser*, 363 U.S. 299, 308 (1960) at 308 (Frankfurter, J., concurring).

Courts have held that, under appropriate circumstances, the IRS can be deemed to have engaged in impermissible discrimination by imposing a tax on one entity while providing more favorable treatment to that entity's competitor. *See International Business Machines Corp. v. United States*, 343 F.2d 914 (Ct. Cl. 1965) ("IBM"); *Oshkosh Truck Corp. v. United States*, 123 F.3d 1477 (Fed Cir. 1997); *Computer Sciences Corp. v. United States*, 50 Fed. Cl. 388, 394–96 (Ct. Fed. Cl. 2001).

That said, the circumstances in which the disparate treatment defense may apply is rather narrow. *See, e.g.*, *Hostar Marine Transp. Sys., Inc. v. United States*, 592 F.3d 202, 210 (1st Cir. 2010) ("The IBM ruling has been limited by subsequent courts to cases involving private rulings"); *Baker v. United Sates*, 748 F.2d 1465, 1469 n.9 (11th Cir. 1984) (stating that "taxpayers who have not requested or received private letter rulings from the IRS will not succeed on a claim of discriminatory treatment because other taxpayers have received private letter rulings on the tax consequences of the same activities"); *Amergen Energy Co., LLC ex rel. Exelon Generation Co., LLC*,

94 Fed. Cl. 413, 420 (Ct. Fed. Cl. 2001) ("To the extent that IBM survives as precedent binding on this court . . . the facts of this case do not resemble IBM and IBM is thus of no avail to plaintiff"); *see also Sherwin Williams*, 403 F.3d at 798 (finding no discrimination where disparate treatment was "an isolated—and . . . erroneous—occurrence").

The Court therefore considers how Flight Options was treated in relation to its competitors to determine whether the IRS's assessment of tax against Flight Options amounts to impermissible disparate treatment.

Having set forth this background to provide context for the issues on trial, the Court turns to its resolution of the final outstanding evidentiary objections.

## IV.    EVIDENTIARY OBJECTIONS

### A.    Introduction

The Court reserved judgment on several evidentiary objections raised by the Government during the trial. The parties have briefed their respective positions on the evidentiary matters raised, and this portion of the Opinion sets forth the Court's rulings on these pending evidentiary matters.

During trial, Flight Options sought to admit the following eight records into evidence during the examination of its witnesses:

| Exhibit Number | Description |
|---|---|
| 32-P | Memorandum written by an IRS employee concerning a meeting of the IRS/NBAA on July 26, 2011 |
| 35-P | January 31, 2012 IRS Routing Sheet and Note to Reviewer for management approval written by an IRS employee |
| 36-P | Note to Reviewer, Form 13839-A written by an IRS employee |

7

| 54-P | April 30, 2013 IRS Memorandum directed to Thomas R. Thomas, Deputy Chief Counsel, Division Counsel and Note to Reviewer written by an IRS employee |
| --- | --- |
| 55-P | IRS Note To Reviewer (but not the post-it note as produced by the USA in discovery in separate case) |
| 58-P | IRS Note to Reviewer, Form 13839-A written by an IRS employee |
| 105-P | IRS Conference Report dated June 19, 2012 |
| 112-P | 2013–2014 Priority Guidance Plan dated August 9, 2013 |
| 113-P | Email of James Conner, IRS Appeals Manager dated October 26, 2009 |

After releasing its last witness, Flight Options then sought to admit the following records, which it asserted were either stipulated to by the Government or were self-authenticating:

| Exhibit Number | Flight Options' Description |
| --- | --- |
| 11-P | No-Change audit closing letter dated September 9, 2014, from the IRS to CitationShares Management, LLC for 26 U.S.C. § 4261 Federal Excise Tax |
| 16-P | February 28, 2014 Revenue Agent's Report and Form 886-A of the IRS Division of Examinations issued to Bombardier Aerospace Corp. and/or Jet Solutions, LLC |
| 19-P | January 17, 2012 Revenue Agent's Report and Form 886-A of the IRS Division of Examinations issued to CitationShares Management, LLC |
| 20-P | September 26, 2012 Revenue Agent's Report and Form 886-A of the IRS Division of Examinations issued to CitationShares Management, LLC |
| 96-P | No-Change audit closing letter dated July 20, 2017, from the IRS Division of Appeals to NetJets Aviation, Inc. for 26 U.S.C. § 4261 Federal Excise Tax |
| 97-P | No-Change audit closing letter dated July 25, 2017, from the IRS Division of Appeals to NetJets Large Aircraft, Inc. for 26 U.S.C. § 4261 Federal Excise Tax |
| 98-P | No-Change audit closing letter dated July 24, 2017, from the IRS Division of Appeals to NetJets International, Inc. for 26 U.S.C. § 4261 Federal Excise Tax |
| 101-P | April 2, 2013 Revenue Agent's Report and Form 866-A of the IRS Division of Examinations issued to NetJets Large Aircraft, Inc. |

| 102-P | April 2, 2013 Revenue Agent's Report and Form 866-A of the IRS Division of Examinations issued to NetJets International, Inc. |
|---|---|
| 103-P | June 21, 2013 revised Revenue Agent's Report calculation of the IRS Division of Examinations issued to NetJets Aviation, Inc. |
| 115-P | April 28, 2014 fax written by an IRS employee and received by Citation-Shares Management LLC's legal representative concerning tax periods beginning January 1, 2005, and ending December 31, 2008 pursuant to CitationShares Management LLC's Offer in Compromise—Doubt as to Liability |
| 116-P | August 13, 2014 letter from CitationShares Management LLC's legal representative and received by an IRS employee |
| 119-P | May 20, 2019 Notices of Assessment to Bombardier Aerospace Corp. prepared by an IRS employee |

The Government objected to the admission of all these records at trial. The Court advised the parties that it would benefit from additional briefing on the nuanced evidentiary arguments presented. The Court conditionally admitted the records over the Government's objections but reserved final judgment pending post-trial briefing.

Having carefully considered the parties' arguments at and after trial, the Court overrules the Government's objections and admits each of these exhibits into evidence.

The admission or exclusion of evidence is a matter committed to this Court's sound discretion, particularly because this was a bench trial. *See Can-Am Engineering Co. v. Henderson Glass, Inc.*, 814 F.2d 253, 255 (6th Cir. 1987); *Somberg v. Utica Community Schools*, 908 F.3d 162, 174 (6th Cir. 2018) (citing *Bath & Body Works, Inc. v. Luzier Personalized Cosmetics, Inc.*, 76 F.3d 743, 750 (6th Cir. 1996)).

The Government argues that the exhibits identified above are irrelevant to Flight Options' refund suit and contain inadmissible hearsay. Flight Options responds that the documents are relevant to the equitable defenses at trial, do not present hearsay concerns, and were largely stipulated to by the Government before trial.

With respect to the parties' disagreement about the extent of the Government's pretrial stipulations, the Court—having had the opportunity to observe the conduct of the parties throughout the lengthy pretrial, trial, and post-trial proceedings—is convinced that the parties went into trial with a good faith idea of the extent of those stipulations. Unfortunately, the ambiguous wording of the stipulations allowed each party to enter trial with different but earnest ideas of what the Government agreed to and what evidence Flight Options would need to present with respect to those exhibits. While more careful drafting could potentially have prevented this situation, the Court need not resolve the parties' dispute about the nature of the pretrial stipulations to resolve these evidentiary arguments. The Court agrees with Flight Options that the documents are admissible.

**B.      Relevance**

Relevant evidence is generally admissible at trial. Fed. R. Evid. 402. Evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. As the proponent of these disputed exhibits, Flight Options had an "extremely low bar" for showing relevance. *E.g.*, *In re Ford Motor Co. Spark Plug & 3-Valve Engine Prod. Liab. Litig.*, 98 F. Supp. 3d 919, 925 (N.D. Ohio 2014).

The Government's relevance objections follow from its attempt to characterize this case as a limited, standard refund action. The Government argues that this case turns on the merits of Flight Options' tax liability, not on any proceedings at the administrative level. *See, e.g.*, *Ruth v. United States*, 823 F.2d 1091 (7th Cir. 1987) (holding that the inquiry in a refund suit turns on the merits of the tax liability and not IRS procedures). In simple terms, if the only issue at trial were whether the excise tax applies to Flight Options' operations—a legal question, although one that

10

could turn on factual issues determined at trial—then the Government contends that internal IRS communications would be irrelevant.

But this trial was not so simple because Flight Options' liability for the tax as a legal matter was decided at summary judgment. Rather, the issue at trial was Flight Options' asserted equitable defenses to liability. In other words, the question before the Court was whether Flight Options need not pay the tax that it owes because of some deficiency in the IRS's conduct as it relates to the tax, either with respect to its duty to provide non-speculative guidance to Flight Options or because the IRS impermissibly discriminated against Flight Options. What individual IRS employees said or did, especially in the context of the IRS's dealings with Flight Options and similarly situated tax-payers, is relevant to those issues.

The Court has reviewed each of the disputed exhibits and finds that, especially in the context of a bench trial, they clear the "extremely low bar" of relevance. The Court is perfectly capable of assigning these exhibits the weight to which they are entitled, a decision that will include—among other things—a consideration of the context and foundation for the documents established at trial (or lack thereof), the nature and timing of the communication, and whether Flight Options established that it knew of the communications during the relevant time periods.

### C.    Hearsay

The Government raises a hearsay objection to seven exhibits—32-P, 35-P, 36-P, 54-P, 55-P, 58-P, and 113-P.

Hearsay is generally not admissible at trial. Fed. R. Evid. 802. "Hearsay" means a statement that a declarant (the person who made the statement) made outside of testimony in the current trial that a party offers in evidence to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801(b)–(c).

There are a number of enumerated examples of statements that are not hearsay, including statements made by a party–opponent. Fed. R. Evid. 801(d)(2). For example, a statement made by a party's agent or employee on a matter within the scope of that relationship can generally be offered against that party at trial. *See* Fed. R. Evid. 801(d)(2)(D).

There are also enumerated exceptions to the hearsay rule. *See* Fed. R. Evid. 803. For instance, a record of an act, event, condition, or opinion is admissible if the record is one of a regularly conducted activity. Fed. R. Evid. 803(6). To fall under the exception, (1) the record must have been made at or near the time by—or from information transmitted by—someone with knowledge; (2) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling; and (3) making the record was a regular practice of that activity. *Id.* Additionally, these prerequisites must be shown by the testimony of the records custodian, another qualified witness, or by a certification that meets certain requirements. *Id.* But the record is not admissible if the opponent of the record shows that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. *Id.*

Finally, there is a residual exception to the hearsay rule. A hearsay statement may be admitted if it is (1) "supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement" and (2) "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts," so long as reasonable notice is provided to the opposing party. Fed. R. Evid. 807.

Flight Options first contends that these seven exhibits were not offered for the truth of the matters asserted in them, but rather because the fact that they were created in the first place corroborates aspects of Michael Nichol's and Talha Zobair's testimony. Flight Options also argues in

the alternative that, even if the Court were to conclude that the documents were offered for their truth, they are admissible as statements of party–opponents.

The Court accepts Flight Options' primary argument—and the limitation inherent within it. The documents are admitted into evidence as non-hearsay statements, but the Court will not consider them for the truth of the matters asserted within them. In the context of a bench trial, and with the benefit of time for careful consideration, the Court is perfectly capable of accepting the limited purpose for which Flight Options says they were offered and affording these exhibits the weight to which they are entitled when determining the extent (if any) to which they corroborate aspects of Mr. Nichol's and Mr. Zobair's testimony.

### D.    Conclusion

For the reasons just discussed, the Court overrules the Government's objections to the exhibits identified above and admits them into evidence.

Having determined the universe of evidence admitted at trial, the Court turns at last to a consideration of the merits of Flight Options' equitable defenses. The Court enters the following findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## V.    FINDINGS OF FACT

A preponderance of the evidence admitted at trial establishes the following facts.

### A.  Background on Flight Options' Fractional Ownership Program

Beginning in 1998 and continuing through the relevant tax periods, Flight Options operated a fractional aircraft ownership program. Under that program, participants purchased a fractional ownership interest in an aircraft (as little as one-eighth of an aircraft) from Flight Options. After

purchasing an interest in an aircraft, fractional owners had the right to use a specified number of flight hours on that aircraft or another aircraft in Flight Options' fleet.

As part of the purchase, Flight Options and its customers entered into a series of contractual documents. Those contracts include a purchase or lease agreement, a management agreement, a dry lease exchange or master interchange agreement, and an owners' agreement.

Through the Purchase Agreement, customers agreed that they could transfer their ownership interests without Flight Options' consent. Fractional owners also agreed that Flight Options may use the aircraft in the fractional aircraft ownership program.

In the Management Agreement, Flight Options agreed to provide certain management services to program participants. Those services included, "but were not limited to: (i) establishing program safety guidelines; (ii) scheduling maintenance, inspection, service, repair, and overhaul of aircraft; (iii) providing aircraft expertise, consultation and administrative services for Aircraft Owners; (iv) arranging for qualified pilot and crewmembers; (v) arranging for all-risk aircraft hull insurance; (vi) maintaining records required by the FAA; (vii) administering a fractional ownership program; and (viii) managing Aircraft Owners' aircraft from within a dry lease exchange pool."

Through the Master Interchange Agreement, fractional owners in the program agreed to share their aircraft with all other participants in the program. Participants also agreed that Flight Options may provide transportation through an aircraft other than the one in which the owner has a fractional interest, so long as the plane is substantially similar to or better than the aircraft in which the owner has the fractional interest.

Flight Options was also permitted to substitute aircraft from outside the program when necessary. Notably, under the Management Agreement, Flight Options retained the right to use the

14

aircraft for its own purposes during periods when those aircraft are not being used to provide transportation to fractional owners, and to keep any proceeds from those flights for itself.

In return for the services it provided, fractional owners paid Flight Options several fees. First, customers paid a monthly management fee. Owners paid the same monthly management fee regardless of whether the owner chose to fly during a billing period. The Management Agreement provided that a fractional owner's failure to pay the monthly management fee constitutes an event of default. The Management Agreement further provided that, if the fractional owner defaults, including by failing to pay the monthly management fee, the fractional owner "shall not be entitled to management services or Aircraft use . . . while the Event of Default continues . . . ."

In addition to the monthly management fee, fractional owners also paid a variable fee for each hour of flight time they used. That fee covered costs of operating the aircraft, including fuel, flight planning, and communication services. Fractional owners also paid an additional fuel surcharge that covers additional costs of fuel.

Flight Options modeled its fractional ownership program after the program operated by NetJets Aviation, Inc. (formerly Executive Jet Aviation Inc.), which innovated this type of program. Flight Options modeled its own contractual documents and its FET-collection practices after what NetJets was doing. Therefore, Flight Options collected and remitted FET on variable rate fees but not on monthly management fees. Debra Perelman, Flight Options' current general counsel, agreed with the government's characterization of this as "mimi[cry]," but she noted that Flight Options' business managers would have consulted with outside tax counsel or an accounting firm, or both, at the time.

During the relevant tax periods, Flight Options competed in a small field. In addition to NetJets, other businesses operating fractional-aircraft-ownership programs included

CitationShares Management, LLC; PlaneSense LLC (formerly, Alpha Flying Inc.); and Bombardier Aerospace Corporation (formerly, Jet Solutions LLC). NetJets claimed and held the lion's share of the market.

During 2011, Flight Options also operated a jet membership program alongside its fractional ownership program, which it called the "Jet Membership Club." Under that program, a customer could purchase a membership in the club through a one-time membership fee. After paying the fee, the customer could separately purchase hours on an aircraft. Unlike fractional owners, membership club members did not own any ownership interest in a specific aircraft.

Like fractional owners, membership club members entered into contractual agreements with Flight Options. Those agreements set forth the amount of flight time that the member was entitled to purchase. Notably, it is undisputed that Flight Options could fulfill its obligation to provide membership club members with flight time by using aircraft that were part of the fractional aircraft program.

### B.  1958 Revenue Ruling

In 1958, the IRS issued Revenue Ruling 58-215, which addressed the application of FET to "payments by the owner of an aircraft to an airline company for the service, maintenance, overhaul, and operation of such aircraft." Revenue Ruling 58-215, 1958 WL 10832, *1. The IRS concluded that the payments were not subject to FET because the relevant corporation–owner owned the aircraft, had exclusive control over the aircraft's personnel, paid the operating expenses of the aircraft, and maintained liability and risk insurance; and because the airline operated the aircraft as an agent for the corporation. *Id.* at *2.

### C. *Executive Jet* Technical Advice Memorandum and Related Litigation

While fractional aircraft ownership programs have existed for some time, the first major litigation resulting from the application of Section 4261 to such programs arose in the 1990s. In 1992, the IRS issued a Technical Advice Memorandum ("TAM"), TAM 9314002, 1992 WL 465951 (Dec. 22, 1992), to Executive Jet Aviation, Inc. (now, NetJets).

In the 1992 TAM, the IRS determined that the amounts aircraft owners paid to Executive Jet for air transportation constituted "taxable transportation" under Section 4261(a) of the Internal Revenue Code. However, the 1992 TAM did not specify precisely which payments were subject to the tax, and, in particular, whether the tax covered the monthly management fees that aircraft owners paid to Executive Jet.

In 1995, Executive Jet filed a refund action in the Court of Federal Claims, challenging the IRS's conclusion that its fractional ownership program was subject to the federal excise tax under Section 4261(a). The Court of Federal Claims ruled in the IRS's favor, holding that Executive Jet was providing taxable transportation under Section 4261(a). *See Executive Jet Aviation, Inc. v. United States*, No. 95-7T (Ct. Fed. Cl.).

The court in *Executive Jet* also concluded, however, that the IRS had not attempted to apply the tax to monthly management fees; therefore, the question of whether those fees were taxable was not before the court. As the court stated:

> The IRS agreed to base the tax on the hourly rate of only $1,060 on the basis of data submitted by EJA regarding comparable charter rates and apparently did not take into account the monthly management fee, or the value of the use of the planes by EJA. (It is unclear, however, why the IRS did not treat any part of the management fee, or the value of the airplanes provided for EJA's use or non-NetJets flights, as an amount paid for taxable transportation and thus subject to the § 4261 tax. Whether this stipulation is as to the historical agreement only, or whether it represents the government's current stipulation as to the proper measure of the tax is also unclear. Since no offset has been pleaded, the court assum[e]s the latter is the case.)

17

(ECF No. 70-12 at 5–6).

The Federal Circuit affirmed, holding that Executive Jet was providing taxable transportation under Section 4261(a) because Executive Jet was providing "commercial transportation" to its customers. *See Executive Jet Aviation, Inc. v. United States*, 125 F.3d 1463 (Fed. Cir. 1997). Like the Court of Federal Claims, the Federal Circuit did not rule on whether the Section 4261(a) tax applied to monthly management fees.

NetJets has not collected the federal excise tax on monthly management fees since those rulings. Because Flight Options adopted NetJet's business model for its own fractional-ownership program, Flight Options' practice was always to collect and remit FET on variable rate fees but not on monthly management fees. That practice continued through the relevant tax periods.

Flight Options' other competitors—CitationShares, PlaneSense, and Bombardier—also collected and remitted FET like NetJets during the relevant tax periods.

### D. *Bombardier* Revenue Examination and Technical Advice Memorandum

After the Executive Jet litigation ended, the IRS conducted revenue examinations of Bombardier Aerospace Corp. and its fractional-ownership program, which was called FlexJets.

The IRS did not apply the Section 4261 tax to FlexJet's monthly management fees for Tax Years 1995 through 2005.

On February 14, 2004, however, the IRS issued a TAM to Bombardier, TAM 143115-03 (the "Bombardier TAM"). In the Bombardier TAM, the IRS expressly concluded that monthly management fees were subject to the federal excise tax under Section 4261(a).

The IRS Appeals Office later conceded the applicability of the federal excise tax on FlexJets's monthly management fees for Tax Years 2004 and 2005, concluding that applying the

18

tax to those fees would place Bombardier at an unfair competitive disadvantage in comparison to Executive Jet (NetJets).

The IRS conducted another examination of Bombardier for Tax Years 2006 and 2007, during which it attempted to apply the Section 4261(a) tax to the monthly management fees. Bombardier filed suit in the Northern District of Texas, challenging the IRS's determination and seeking to recover and abate the tax. Both the district court and the Fifth Circuit rejected Bombardier's arguments, holding that Bombardier was providing taxable transportation, and that the monthly management fees were taxable under Section 4261(a). *See Bombardier Aerospace Corp. v. United States*, 94 F. Supp. 3d 816 (N.D. Tex. 2015), *aff'd*, 831 F.3d 268 (5th Cir. 2016). Both courts also rejected Bombardier's arguments that the IRS had failed to give it sufficiently clear guidance of its collection obligations and that it was being unfairly discriminated against compared to other industry participants.

### E.  The Zobair Memorandum

Flight Options was wholly owned by Raytheon from March 2002 to November 2007.

In 2006, Flight Options began communicating with other fractional-program operators to determine how its competitors were handling the potential application of the Section 4261(a) tax to monthly management fees. It learned that none of its competitors were collecting excise taxes on the monthly management fees.

On September 22, 2006, Talha Zobair—who was tax counsel for Raytheon—wrote a memorandum analyzing Flight Options' tax position with respect to the monthly management fees (the "Zobair Memo"). (ECF No. 73-4). Mr. Zobair explained that Raytheon was preparing to sell Flight Options, and the issue of the company's FET collection practices were identified during

Raytheon's reverse due diligence as an "exposure." Mr. Zobair testified that "any good diligence" from prospective buyer "would have identified these issues."

The Zobair Memo stated that the Bombardier TAM was not precedential with respect to Flight Options but advised that the TAM was "an indication of where the IRS may come out on a similar fact pattern." *Id.* at 5. The Zobair Memo related that Bombardier's tax counsel anticipated that Bombardier would be able to settle the issue with the IRS Appeals Office without paying the federal excise tax on the monthly management fees. The Zobair Memo laid out Bombardier's tax counsel's prepared arguments against the application of the tax, noting that Bombardier's counsel believed that company had a "70 percent" chance of success in obtaining a refund. *Id.* at 8.

Zobair's assessment of litigation risk was less rosy. The Zobair Memo concluded that while "it is currently difficult to determine with any degree of certainty the [Flight Options] exposure for [federal excise tax] on the management fee portion . . . the range of potential liability is zero to $69.2M." *Id.* at 9.

Nevertheless, the memorandum noted that, based on industry practice and the *Executive Jet* decision, Flight Options decided to continue its practice of not collecting federal excise tax on the monthly management fees while "work[ing] with others in the fractional ownership industry to actively lobby for a definitive IRS policy or tax legislation confirming no [federal excise tax] on management fees for fractional ownership arrangements." *Id.* at 9.

Mr. Zobair testified about the decision:

> Q. . . . Did the outcomes of audits of other fractional management companies influence Flight Options' decision not to collect excise tax on the monthly management fees?
>
> A. So I would again say yes. So I consider Executive Jet an audit that eventually went to court and there was a court case settled, and we had an answer. So I'll start with that. On a second piece, along the way, we were learning about outcomes. Clearly we were very interested in what Appeals did with

Flexjet in their subsequent audit period. And if it was favorable, which it sounds like it was expected to be favorable, that definitely would have been something important for us to know, and it would have confirmed our opinion.

Q. Your opinion that the monthly management fees were not included in the excise tax base?

A. Yeah.

### F. *NetJets* Litigation

In 2007, the IRS conducted another examination of NetJets's federal excise tax liability. *See NetJets Large Aircraft, Inc. v. United States*, 80 F. Supp. 3d 743, 751 (S.D. Ohio 2015). Following the examination, the IRS retroactively assessed the federal excise tax upon the monthly management fees and variable fuel surcharges that NetJets had received from fractional owners, along with penalties and interest. *Id.*

NetJets filed suit in the Southern District of Ohio. The district court held that NetJets was collaterally estopped from challenging whether it provided taxable transportation in light of the prior rulings of the Federal Court of Claims and the Federal Circuit in the *Executive Jet* litigation. *Id.* at 753–54. The court also held, however, that the 1992 TAM precluded the IRS from collecting the Section 4261(a) tax on monthly managements fees. *Id.* at 756–58. In reaching its holding, the NetJets court concluded that "a mountain of undisputed evidence shows that the 1992 TAM applies the § 4261 tax to only the occupied hourly fee" and that TAM had never been revoked. *Id.* at 756 (emphasis in original).

### G. Discussions Between the IRS and the Fractional Ownership Industry

In response to the Bombardier TAM, industry participants approached the National Business Aviation Association ("NBAA") to engage with the IRS. The NBAA requested a meeting with the IRS's Examination Division and Office of Chief Counsel. In February 2009, the IRS and the

NBAA met to discuss the taxation of management fees. The NBAA meetings with the IRS were not exclusively focused on the fractional jet industry; they dealt with taxation across multiple ownership structures.

As a result of those meetings, the NBAA and the IRS formed a working group to analyze the taxation of management fees to those various structures.

### H.  Flight Options Audits

The IRS subsequently conducted an examination of Flight Options for the 2004 through 2007 tax years. On September 11, 2008, the IRS issued a revenue agent report ("RAR") to Flight Options. (ECF No. 70-10). In the 2008 RAR, the agent took the position that Flight Options owed federal excise tax on the monthly management fees because those fees were amounts paid for taxable transportation under Section 4261(a).

Flight Options submitted a protest on October 16, 2008, arguing that it was not providing taxable transportation and that, in any event, the monthly management fees were not amounts paid for such transportation. Flight Options also argued that imposing the federal excise tax on monthly management fees would result in disparate treatment of Flight Options in relation to its competitors.

On October 22, 2009, the IRS met with Flight Options and its counsel. On October 26, 2009, James Conner, an IRS Appeals Manager, wrote an email summarizing the meeting. Mr. Conner stated that Flight Options had argued that the tax should not be imposed upon it because NetJets was not paying the tax on monthly management fees in light of the 1992 Executive Jet TAM and court rulings in the subsequent *Executive Jet* litigation. Mr. Conner also wrote that Flight Options' counsel had "suggested that a ruling request should be made."

The email did not specify what Flight Options' counsel meant by a "ruling request." Mr. Conner wrote that he "agreed" a ruling request should be made and that Flight Options' counsel would work with the IRS Appeals Office on the request.

Flight Options characterizes this "ruling request" as a request for a TAM, but this characterization is not supported by the evidence. While Treasury Regulations allow a taxpayer to orally request a TAM, internal IRS records reflect that Flight Options expressed a "desire to get TAM if no settlement is reached." (*See* JX-15.) Further, Flight Options never followed up on any such oral request in writing, despite continued written communication with the IRS.

On December 9, 2010, Flight Options' counsel made a formal request to the IRS under the IRS's Industry Issue Resolution program ("IIR") for consideration of the excise tax to monthly management fees paid by fractional owners. In the request, counsel took the position that the law was unclear, and that guidance was needed given that uncertainty and the risk of inconsistent treatment of taxpayers. In an internal "Note to Reviewer," an IRS agent noted that the issue was a "major issue in [the] industry resulting in a number of field examination cases being closed/unagreed to appeals." The IRS agent also noted that the IRS Appeals' Office decisions in some instances excusing taxpayers from liability had "created confusion in this industry and the field as to the application of the transportations of persons by air tax under IRC 4261 to management company fees."

On July 25, 2011, Flight Options filed suit in the Northern District of Ohio challenging the IRS's assessments for all tax periods between March 31, 2004 and December 31, 2007, in a case captioned *Flight Options, LLC v. United States* (Case No. 1:11-cv-01531). The parties subsequently settled the case. As part of the settlement, the Government retained the Section 4261 taxes

that had been collected on the fixed and fuel variable portions of the hourly fee, but refunded Flight Options 80% of the tax collected on monthly management fees.

The IRS subsequently conducted another examination of Flight Options for the period from January 1, 2009 through March 31, 2012. The IRS determined that Flight Options had not collected the Section 4261(a) tax with respect to the monthly management fees for any of the periods in that timeframe. Based on the examination, the IRS imposed assessments of $16 million for the monthly management fees, plus additional penalties and interest, along with several smaller assessments.

## I.   The 2011 CCA

On September 15, 2011, the IRS issued a Chief Counsel Advisory ("CCA"), CCA 201141018, 2011 WL 4873352 (Oct. 14, 2011), addressing the application of the Section 4261 tax to fractional aircraft programs. The CCA stated that monthly management fees that a participant paid to a fractional aircraft program operator were amounts paid for taxable transportation under Section 4261.

## J.   *PlaneSense* Litigation

The IRS also conducted an audit of PlaneSense Inc. for Tax Periods April 1, 2004 through June 30, 2006. The audit was settled on or around July 30, 2013 prior to trial. The terms of the settlement included that the IRS conceded on the entirety of its claim for uncollected FET on monthly management fees and fuel surcharges, while PlaneSense conceded the entirety of its re-fund claim for FET it had collected on variable-rate fees. *See PlaneSense Inc. f/k/a Alpha Flying, Inc. v. United States*, Docket No.  1:11-cv-00136-PB (D.N.H. Mar. 22, 2011). (Joint Stipulation of Fact, ECF No. 130, PageID# 4469.)

24

### K.  Executive Jet Management, Inc. Litigation

Executive Jet Management, Inc. (EJM) is a related entity to NetJets and operated aircraft management services for wholly owned aircraft. The IRS audited EJM, and EJM filed suit against the United States to challenge the assessment of FET on monthly management fees. The court in *NetJets Large Aviation Inc. v. United States*, Case No. 2:11-cv-1023, 2015 WL 7784925 (S.D. Ohio Nov. 12, 2015) ("*EJM*"), found in favor of EJM that no FET was owed on monthly management fees pursuant to the deputy tax collector defense. The IRS issued no published guidance providing that the application of the possession, command, and control test was different for the management of wholly owned aircraft, as opposed to the management of fractionally owned aircraft.

## VI.    CONCLUSIONS OF LAW

### A.  Relevant Tax Code Provisions

Section 4261 of the Internal Revenue Code imposes a tax on "the amount paid for taxable transportation," which includes certain transportation by air. 26 U.S.C. § 4261(a). In addition, Section 4081 of the Internal Revenue Code imposes an excise tax on the sale of aviation fuel. *See* 26 U.S.C. § 4081. The rate at which fuel is taxed depends on whether that fuel is being used for commercial or non-commercial purposes. *See* 26 U.S.C. § 4081(a)(2)(C)(i) and (ii). Non-commercial fuel is taxed at a significantly higher rate than commercial fuel. *Id.*

The Court determined at the summary judgment stage that, for the relevant time periods, (1) Flight Options was providing "taxable transportation" subject to the federal excise tax as that term is used in the relevant provisions of the Internal Revenue Code; and (2) the taxable "amounts paid" for such transportation include the monthly management and membership fees that Flight Options' customers paid to Flight Options.

The Section 4261(a) tax is a "collected tax," which means that Flight Options was responsible for collecting the tax from participants in the program and remitting the tax to the IRS.

Section 4263(c) of the Internal Revenue Code provides that the federal excise tax may be assessed directly against a program operator who does not collect or remit the tax. *See* 26 U.S.C. § 4263(c).

Effective April 1, 2012, Congress amended the Internal Revenue Code to expressly exclude fractional ownership program operators from excise taxes under Section 4261. *See* 26 U.S.C. § 4261(j); P.L. 112-95, § 1103(c). In particular, Section 4261(j) provides that "[n]o tax shall be imposed by this section or section 4271 on any air transportation if tax is imposed under section 4043 with respect to the fuel used in such transportation." The effect of Section 4261(j) was to make fractional aircraft program operators exempt from federal excise tax on a going-forward basis, while imposing an additional fuel tax on fractional ownership aircraft programs.

**B.  Burden of Proof and Trial Issues**

In this tax refund proceeding, Flight Options bears the burden of proof and persuasion. *See, e.g.*, *Fitzgerald Truck Parts and Sales, LLC v. United States*, 132 F.4th 937, 950 (6th Cir. 2025) (citing *Sherwin-Williams Co. v. United States*, 403 F.3d 793, 796 (6th Cir. 2005)); *see also Helvering v. Taylor*, 293 U.S. 507, 514, 55 S.Ct. 287, 79 L.Ed. 623 (1935). Its burden is to produce evidence showing, by the preponderance of the evidence, that the IRS's assessment is not correct. *E.g.*, *Sinder v. United States*, 655 F.2d 729, 731 (6th Cir. 1981).

The Court's order on the parties' cross-motions for summary judgment left two main issues for trial. First, the Court reserved for trial whether Flight Options should be excused from its failure to collect and remit FET on monthly management fees, hourly fees, fuel surcharges, lease payments, and membership fees paid to it by its customers, under the defense recognized in *Cent.*

*Illinois Pub. Serv. Co. v. United States*, 435 U.S. 21 (1978). *See* ECF No. 90 at 35. Second, the Court set for trial the question of whether the IRS "impermissibly discriminated against Flight Options vis-à-vis its competitors" such that Flight Options should be relieved of its FET liability for the above-mentioned fees paid by Flight Options' customers. *Id.* at 48; *see also Int'l Bus. Machines Corp. v. United States*, 343 F.2d 914 (Ct. Cl. 1965). Both of these affirmative defenses are equitable in nature.

The Court also reserved for trial a sub-issue of whether, under 26 U.S.C. § 6664, Flight Options should be excused from failure-to-pay penalties assessed against it by the IRS based on a reasonable cause defense. ECF No. 49. Again, Flight Options bears the burden of proof and persuasion on all three issues. *See* ECF No. 90 at 20.

### C. Where Flight Options Received Actual Notice of the IRS's Position on Monthly Management Fees, It Did Not Meet its Burden to Show that the IRS Failed to Provide Precise and Non-Speculative Guidance on its Federal Excise Tax Collection Obligations.

The preponderance of the evidence supports a conclusion that the IRS provided sufficiently precise and non-speculative guidance on Flight Options' FET-collection obligations.

As discussed further above, Flight Options mirrored NetJets's business model when determining how to collect FET from its customers. While Flight Options would likely have engaged tax counsel and accounting assistance in setting up its operations, the evidence supports a conclusion that Flight Options sought to copy NetJets's practices wholesale. Flight Options did not, at least initially, independently consider the 1992 TAM or the litigation history of *Executive Jet Aviation, Inc. v. United States*, No. 95-7T (Ct. Fed. Cl.), when setting up its collection model.

IRS issued the 2004 TAM to Bombardier years before the tax periods at issue in this case; the TAM specifically concluded that monthly management fees were subject to the FET.

27

It seems that Flight Options evaluated a risk for tax exposure sometime prior to the Zobair Memo in September 2006, but, in any event, Raytheon's prospective sale of Flight Options brought the issue to the fore.

The Court finds the Zobair Memo to be extremely persuasive as to Flight Options' deputy tax collector defense. The document reflects that Mr. Zobair and Flight Options' tax manager appreciated, as early as September 2006, that while the *Executive Jet* opinion (No. 95-7T (Ct. Fed. Cl.)) had been used as justification for the existing industry-wide "business decision" to omit monthly management fees from FET collection, there was also an argument that the court had simply failed to address the possible application of FET to those fees. The memorandum documents that Raytheon's counsel considered it a "key question" for Bombardier's counsel whether the *Executive Jet* opinion would actually support a conclusion that monthly fees were not subject to the FET, and further documents that Bombardier's counsel "*agreed*" (emphasis added) that drawing a distinction between variable and monthly fees "may be somewhat tenuous." The use of the word "agreed" strongly suggests that Raytheon's counsel held a similar opinion of the argument. Bombardier's counsel assessed a "70%" percent of success on obtaining a refund, but Mr. Zobair cautioned that "it is difficult to be sure" that Flight Options' position would be similar "until a more detailed analysis of Flex Jets' facts and appeals posture are evaluated."

The Zobair Memo further documented that Flight Options appreciated that the 2004 Bombardier TAM, while not binding precedent, was "an indication of where the IRS may come out on a similar fact pattern." Flight Options readily appreciated that its situation was a similar fact pattern. Mr. Zobair concluded that it was "difficult to determine with any degree of certainty the . . . exposure for FET on the management fee portion" and advised that "the range of potential liability is zero to $69.2M."

28

In other words, the 2004 TAM was sufficiently precise to put Flight Options on actual notice as of at least September 2006 that the IRS considered management fees to be subject to FET under circumstances analogous to the FlexJet program—and Flight Options was analogous to FlexJet. While Flight Options points out that a TAM is not formally precedential as to other taxpayers, the Court rejects the idea that it must ignore the TAM—and its effect on Flight Options—when considering Flight Options' equitable deputy tax collector defense.

The fact that Flight Options received actual notice of the IRS's position on the matter distinguishes this case from *General Elevator*, where the plaintiff—to appreciate the IRS's position—would have had to appreciate the significance of a vague and indefinitely suspended revenue ruling and then investigate the law about possible withholding to ensure that its system was in compliance with the regulations. *See* 20 Cl.Ct. at 353.

In other words, a preponderance of the evidence established that Flight Options received actual notice of "what the IRS thinks the law is and . . . what actions [it has] to take," and therefore it has not met its burden to show that the IRS failed to provide sufficient notice. *Central Illinois*, 435 U.S. at 31–32.

Further, Flight Options received more precise notice in 2008, when a revenue agent prepared an RAR taking the position that Flight Options owed federal excise tax on the monthly management fees with respect to previous tax years because those fees were amounts paid for taxable transportation under Section 4261(a).

To be sure, the fractional aircraft industry approached the IRS seeking a formal ruling that FET does not apply to monthly management fees and expressing confusion. Further, internal IRS communications reflect that individual IRS employees expressed a desire for the agency to issue more formal guidance and noted the confusion expressed by industry participants about FET

obligations. IRS Appeals at times took contrary positions on the matter from individual revenue agents. The Court has reviewed the admitted exhibits closely. The Court further notes that Flight Options made a formal IIR request to the IRS in 2010, taking the position that the law was unclear and that guidance was needed given that uncertainty and the risk of inconsistent treatment of taxpayers.

In an internal "Note to Reviewer," an IRS agent noted that the issue was a "major issue in [the] industry resulting in a number of field examination cases being closed/unagreed to appeals." The IRS agent also noted that the IRS Appeals' Office decisions in some instances excusing taxpayers from liability had "created confusion in this industry and the field as to the application of the transportations of persons by air tax under IRC 4261 to management company fees."

Finally, the Court notes that IRS frequently settled disputes with fractional aircraft companies by conceding some or all of the tax on monthly management fees.

But the question before the Court is not whether the IRS could have been clearer in its guidance to the industry on this question. The question is whether the agency provided precise and non-speculative guidance to put Flight Options on notice of its obligations.

On that question, in light of the 2004 TAM, the analysis of it in the 2006 Zobair Memo (directed specifically to Flight Options), and the 2008 RAR (again, directed to Flight Options)— and where Flight Options by the time of the relevant tax periods understood that the IRS was engaged in audits and litigation with other industry participants on this very issue—the preponderance of the evidence supports a conclusion that the IRS provided sufficient guidance to put Flight Options on notice of the government's position and Flight Options' collection obligations.

Flight Options made a business decision to accept the risk of an audit and litigation over its decision not to collect FET on the management fees. It may have hoped, even reasonably, that

30

it would be able to negotiate a result with IRS Appeals similar to that reached by Bombardier in 2006 and 2007. It may have believed that it had strong arguments that FET should not apply to the variable or monthly fees at all, and that it had non-frivolous arguments to distinguish between variable and monthly fees. But it has not met its burden to show that this case raises *Central Illinois* concerns.

The Court also rejects Flight Options' contention that this case should be controlled by *EJM*. Again, Flight Options received actual notice in this case of the IRS's position as to fractional programs through the 2004 TAM and then the 2008 RAR. That distinguishes Flight Options' situation from that of EJM and the whole aircraft management industry. Moreover, Flight Options has not shown that it was actually confused; to the contrary, the evidence establishes that Flight Options and the NBAA saw the fractional and whole aircraft industries as separate, related industries.

None of Flight Options' arguments is sufficient to carry its burden to show that it should be excused of liability under the *Central Illinois* test. The Court therefore finds in the Government's favor on that equitable defense.

**D. Where Flight Options Did Not Request a Private Letter Ruling and Where Any Allegedly Disparate Treatment Was the Result of Litigation Judgments or Settlements, Flight Options Failed to Meet its Burden to Show that the IRS Discriminated Against It Compared to its Competitors.**

As discussed above, the disparate treatment defense finding its roots in *IBM* has been construed narrowly. *See, e.g.*, *Hostar Marine Transp. Sys., Inc. v. United States*, 592 F.3d 202, 210 (1st Cir. 2010); *Baker v. United Sates*, 748 F.2d 1465, 1469 n.9 (11th Cir. 1984). Flight Options did not request a private letter ruling in this case, the preponderance of the evidence supports a conclusion that it did not request a TAM or other similar guidance either, and the case does not resemble *IBM* in other ways that would raise similar disparate treatment concerns. That said, the Court agrees that *Sherwin-Williams* "implied that such a [disparate treatment] argument could be

31

meritorious" outside of that narrow context "with the right evidence." *NetJets Large Aircraft, Inc. v. United States*, No. 2:11-cv-1023, 2014 WL 1672588, at *5 (S.D. Ohio Apr. 28, 2014).

But Flight Options' disparate treatment argument focuses on a disparate effect—namely that its competitors were not, at the end of the day, forced to pay FET on monthly management fees or fuel surcharges. Flight Options complains that the IRS has not conceded the issue in its case, which Flight Options argues puts it at a competitive disadvantage. Yet this argument conflates disparate effect with a discriminatory cause.

The preponderance of the evidence supports a conclusion that any difference in tax treatment between Flight Options and its competitors is the result of either a final judgment obtained through litigation, or settlements. As the Government points out, "the discretion vested in the IRS to settle tax cases is by its very nature a discretion to treat similarly situated taxpayers differently." *Bunce v. United States*, 28 Fed. Cl. 500, 511 (1993) (emphasis added), aff'd, 26 F.3d 138 (Fed. Cir. 1994). The fact that the IRS, in the context of a settlement, agreed to forego litigation as to a particular tax to obtain some benefit (such as a concession on a different tax) does not equate to a legal concession that the former was not properly assessed.

Indeed, the IRS audited all of the fractional aircraft management companies on the management fee issue after 2004 TAM was issued. In each instance, the IRS assessed the tax after no settlement was reached with the taxpayer through the IRS Appeals process. Four fractional operators—Flight Options, PlaneSense, Bombardier, and NetJets—then filed refund suits in district court between 2011 and 2013. The government settled two of those cases (Flight Options and PlaneSense), won one (Bombardier), and lost one (NetJets).

Put simply, the facts of this case do not resemble *IBM* or any case in which courts have found disparate treatment. The Court, after reviewing the exhibits and carefully considering the

32

testimony of the witnesses, finds that this is not a case with the "right evidence" for a taxpayer to be shielded from liability under the disparate treatment defense.

### E.   Where Flight Options Unreasonably Relied on an Individual IRS Employee's Alleged Statement that There Would Be No Failure-to-Pay Penalties, Flight Options is Liable for Those Penalties.

A penalty shall be imposed for the failure to pay any amount of tax required unless the failure is due to reasonable cause and not willful neglect. 26 U.S.C. § 6651. The IRS has assessed such failure-to-pay penalties because Flight Options failed to pay its FET tax in full and instead paid a divisible portion of the tax.

"The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances." *Kerman v. Comm'r of Internal Revenue*, 713 F.3d 849, 868 (6th Cir. 2013) (quoting 26 C.F.R. § 1.6664-4(b)(1)).

Flight Options contends that it acted with reasonable cause "based on its interpretation of the tax law" and based on an individual IRS employee's alleged statement that no penalty would be assessed. Flight Options fails to carry its burden to show reasonable cause by a preponderance of the evidence.

As discussed further above, the preponderance of the evidence supports a conclusion that Flight Options knew IRS's position on the application of FET long before the tax period at issue and chose not to fully collect the tax based on a business decision made in conjunction with its competitors, understanding the potential liability (including penalties) that may attach for its failure to collect the tax.

Moreover, it was unreasonable for a sophisticated taxpayer like Flight Options to rely on an individual IRS employee's alleged oral statement that no penalties would be assessed. *See, e.g.*,

*Hollow v. United States*, 1998 WL 760908, at *2 (W.D. Tenn. Feb. 4, 1998); *Fuller v. United States*, 475 F. Supp. 3d 762, 767–68 (S.D. Ohio 2020).

After carefully considering the facts and circumstances of Flight Options' failure to collect the relevant tax, the Court finds that Flight Options failed to meet its burden to show reasonable cause to avoid paying the statutory failure-to-pay penalties.

## VII.    CONCLUSION

The Court finds in favor of the Government on Flight Options' refund suit and enters judgment in the Government's favor on the Complaint. (ECF No. 1.) The Court further finds in the Government's favor on its counterclaim (ECF No. 20, PageID# 441) and issues a judgment against Flight Options in the amount of **$24,025,454.90, plus any interest and penalties (including failure-to-pay penalties) accruing after August 9, 2016**. A separate judgment will issue.

**IT IS SO ORDERED.**

Dated:  May 28, 2025             */s Jennifer Dowdell Armstrong*
                               JENNIFER DOWDELL ARMSTRONG
                               UNITED STATES MAGISTRATE JUDGE

## APPENDIX
### *Identification of Evidence Considered in Reaching Decision*

### *Witness Testimony*

| Name | Trial Transcript Page Ranges |
|---|---|
| **Gary Arber**<br>*Former general counsel,*<br>*PlaneSense, Inc./Alpha Flying* | **Tr. 500–588**<br>ECF No. 143, PageID# 5013–5101 |
| **Bruce Marshall**<br>*Bombadier* | **Tr. 57–178**<br>ECF No. 141, PageID# 4570–4691 |
| **Michael Nichols**<br>*National Business Aviation*<br>*Association* | **Tr. 185–371**<br>ECF No. 142, PageID# 4698–4884 |
| **Debra Perelman**<br>*Corporate representative,*<br>*Flight Options, LLC* | **Tr. 589–744**<br>ECF No. 143, PageID# 5102–5174<br>ECF No. 144, PageID# 5179–5257 |
| **Talha Zobair**<br>[testified by deposition]<br>*General Counsel, Raytheon* | **Tr. 372–499**<br>ECF No. 142, PageID# 4885–4914<br>ECF No. 143, PageID# 4918–5012 |

*Joint Exhibits*

| Exhibit Number | Description |
|---|---|
| 1 | IRS Appeal Office Concession Letter to Jet Solutions LLC, March 10, 2006 |
| 2 | IRS Appeals Office Letter to Bombardier, March 22, 2007 |
| 3 | IRS Appeals Office Letter to Bombardier, March 1, 2007 |
| 4 | 2004 IRS Technical Advice Memorandum to Jet Solutions, LLC |
| 5 | Letter from NBAA to Jodi Angelo, Jan. 9, 2009 Re: Audit Technique Guide |
| 6 | Letter from Mike Nichols to Jodi Angelo, Apr. 9, 2010 Re: NBAA Meeting Materials |
| 7 | Email from Tony Gasaway to Mike Nichols, June 24, 2011 Re: Participation in July 26 meeting |
| 8 | Letter from Tony Gasaway to Mike Nichols, Apr. 7, 2009 Re: Fractional Participation in NBAA |
| 9 | IRS CCA 201141018 – Oct. 14, 2011 |
| 10 | Memo from Talha Zobair to Tax Files/Flight Options, LLC, Sept. 22, 2006 |
| 11 | September 26, 2006 Fractional Aircraft Ownership Industry Briefing |
| 12 | Email from Nina Garvey to Larry Brainard, et al., Sept. 26, 2007 Re: Oct. 2007 Fractional Industry Meeting |
| 13 | Email from Talha Zobair to Nina Garvey, et al., Sept. 22, 2008 Re: Audit Technique Guide |
| 14 | Email from Pam Olson to Talha Zobair, et al., Mar. 30, 2009 Re: Raytheon Participation in NBAA Meetings |
| 15 | IRS Appeals Case Activity Record Print Re: Flight Options, Dec. 2, 2009 |
| 16 | Letter from Pam Olson to IRS, Dec. 9, 2010, Re: Plaintiff's IIR Request |
| 17 | *EJA v. United States*, No. 95-7T, U.S.C.F.C. March 29, 1996 |
| 18 | IRS Revenue Agent Report to Alpha Flying, Inc. Feb. 21, 2007 |
| 19 | PlaneSense Stipulation of Dismissal, July 30, 2013 |
| 20 | IRS Appeals Concession Letter to PlaneSense, Inc., Aug. 7, 2013 |
| 21 | 1992 IRS Technical Advice Memorandum to EJA |
| 22 | Revenue Agent Report to NetJets, Jan. 15, 2009 |
| 23 | Revenue Agent Report to Bombardier Aerospace Corp., July 30, 2006 |

*Flight Options' Exhibits*

| Exhibit Number | Description |
|---|---|
| 2-P | United States' appellee brief that was signed and filed by the United States in NetJets 2 that is available on Westlaw |
| 4-P | Request for Technical Advice of the IRS Division of Examinations that was submitted to the IRS Office of Chief Counsel as part of the preparation of the 1992 TAM |
| 7-P | Excerpts of the IRS's memoranda in its FET audit files regarding Bombardier and/or Jet Solutions for tax periods beginning July 1, 1998 and ending December 31, 2005 |
| 11-P | No-Change audit closing letter dated September 9, 2014, from the IRS to CitationShares Management, LLC for 26 U.S.C. § 4261 Federal Excise Tax |
| 12-P | July 14, 2017 letter written by Marty Hiller, President of the National Aviation Transportation Association |
| 16-P | February 28, 2014 Revenue Agent's Report and Form 886-A of the IRS Division of Examinations issued to Bombardier Aerospace Corp. and/or Jet Solutions, LLC |
| 18-P | June 1, 2012 Revenue Agent's Report and Form 886-A of the IRS Division of Examinations issued to PlaneSense |
| 19-P | January 17, 2012 Revenue Agent's Report and Form 886-A of the IRS Division of Examinations issued to CitationShares Management, LLC |
| 20-P | September 26, 2012 Revenue Agent's Report and Form 886-A of the IRS Division of Examinations issued to CitationShares Management, LLC |
| 21-P | November 20, 2013 Revenue Agent's Report and Form 886-A of the IRS Division of Examinations issued to Flight Options |
| 32-P | Memorandum written by an IRS employee concerning a meeting of the IRS/NBAA on July 26, 2011 |
| 35-P | January 31, 2012 IRS Routing Sheet and Note to Reviewer for management approval written by an IRS employee |
| 36-P | Note to Reviewer, Form 13839-A written by an IRS employee |
| 40-P | April 20, 2012 letter received by the IRS |

| | |
|---|---|
| 54-P | April 30, 2013 IRS Memorandum directed to Thomas R. Thomas, Deputy Chief Counsel, Division Counsel and Note to Reviewer written by an IRS employee |
| 55-P | IRS Note To Reviewer (but not the post-it note as produced by the USA in discovery in separate case) |
| 58-P | IRS Note to Reviewer, Form 13839-A written by an IRS employee |
| 69-P | July 12, 2004 Revenue Agent's Report and Form 886-A of the IRS Division of Examinations issued to Bombardier and/or JetSolutions |
| 91-P | June 12, 2012 Letter from NBAA to Frank Boland |
| 96-P | No-Change audit closing letter dated July 20, 2017, from the IRS Division of Appeals to NetJets Aviation, Inc. for 26 U.S.C. § 4261 Federal Excise Tax |
| 97-P | No-Change audit closing letter dated July 25, 2017, from the IRS Division of Appeals to NetJets Large Aircraft, Inc. for 26 U.S.C. § 4261 Federal Excise Tax |
| 98-P | No-Change audit closing letter dated July 24, 2017, from the IRS Division of Appeals to NetJets International, Inc. for 26 U.S.C. § 4261 Federal Excise Tax |
| 101-P | April 2, 2013 Revenue Agent's Report and Form 886-A of the IRS Division of Examinations issued to NetJets Large Aircraft, Inc. |
| 102-P | April 2, 2013 Revenue Agent's Report and Form 886-A of the IRS Division of Examinations issued to NetJets International, Inc. |
| 103-P | June 21, 2013 revised Revenue Agent's Report calculation of the IRS Division of Examinations issued to NetJets Aviation, Inc. |
| 105-P | IRS Conference Report dated June 19, 2012 |
| 112-P | 2013–2014 Priority Guidance Plan dated August 9, 2013 |
| 113-P | Email of James Conner, IRS Appeals Manager dated October 26, 2009 |
| 114-P | April 28, 2014 fax written by an IRS employee and received by Citation-Shares Management LLC's legal representative concerning tax periods beginning January 1, 2005, and ending December 31, 2008 pursuant to CitationShares Management LLC's Offer in Compromise |
| 116-P | August 13, 2014 letter from CitationShares Management LLC's legal representative and received by an IRS employee |
| 119-P | May 20, 2019 Notices of Assessment to Bombardier Aerospace Corp. prepared by an IRS employee |
| 122-P | October 13, 2015 Stipulations of Dismissal in Flight Options |
| 133-P | February 27, 2007 IRS Memorandum of Appeals 2d Bombardier Audit |
| 136-P | February 25, 2009 letter and attachments from Mike Nichols, Vice President of the National Business Aviation Association, Inc. |
| 139-P | Three emails written by and/or received by Jody Angelo, an IRS employee, the latest dated December 16, 2009 |
| 140-P | January 14, 2010 letter of representative of FO to NBAA |

| | |
|---|---|
| 141-P | March 4–5, 2010 Meeting Summary of the Air Transportation Excise Taxes Industry and IRS Meeting |
| 148-P | July 26, 2011 Air Transportation Excise Taxes Meeting with IRS and Representatives of Business Aviation Industry Proposed Agenda |
| 152-P | June 19, 2012 Air Transportation Excise Taxes Meeting with IRS and Representatives of Business Aviation Industry Proposed Agenda written by the National Business Aviation Association, Inc. |
| 155-P | August 17, 2011 email from Zobair to Arber regarding requests for guidance |
| 164-P | August 2, 2019 USA's Response to 1st RFA |
| 165-P | August 2, 2019 USA's Response to 1st RFPD |
| 166-P | August 2, 1019 USA's Response to 1st ROGs |
| 167-P | November 29, 2019 USA's Response to 2d RFPD |
| 168-P | March 20, 2024 USA's Response to 2d RFA |
| 169-P | March 20, 2024 USA's Response to 3rd RFPD |
| 170-P | March 20, 2024 USA's Response to 2d ROGs |
| 171-P | April 17, 2024 USA's Response to 3d RFA |
| 172-P | April 17, 2024 USA's Response to 4th RFPD |
| 173-P | April 17, 2024 USA's Response to 3d ROG |
| 182-P | I.R.S. Chief Couns. Notice CC-2003-014 (May 8, 2003) |
| 186-P | FO 3Q 2011 Form 720 Federal Excise Tax Return |

*Government's Exhibits*

| Exhibit Number | Description |
|---|---|
| DX-5 | Rev. Proc. 2009-2 Re: Requesting TAMS – Jan. 1, 2009 |
| DX-14 | Email from Talha Zobair to Tony Gasaway July 11, 2007 Re: Please call me |
| DX-15 | H.I.G. Capital Management Letter to Raytheon, August 27, 2007 |
| DX-16 | Revenue Agent Report to Flight Options, Sept. 11, 2008 |
| DX-17 | Email from Larry Brainard to Nina Garvey, et al., Sept. 12, 2007 Re: Fractional Industry Tax Meeting |
| DX-19 | Email from Talha Zobair to Nina Garvey, Oct. 3, 2007 Re: Fractional Meeting |
| DX-21 | Email from Talha Zobair to Tony Gasaway May 27, 2008 Re: Status of Flight Options FET Exam |
| DX-23 | Email from John Burns to Mike Nichols, Oct. 27, 2008 Re: Treasury Fet Audit Guide |
| DX-24 | Email from Tony Gasaway to Nina Garvey, et al., Nov. 5, 2008 Re: Meeting in December? |
| DX-27 | Email from Tony Gasaway to Mike Nichols Feb. 10, 2009 Re: FET |
| DX-28 | Memo from Tony Gasaway to Nina Garvey and Gary Arber Mar. 25, 2009 Re: NBAA Considerations |
| DX-29 | October 16, 2008 Flight Options Protest Letter |
| DX-32 | Email from Tony Gasaway to Talha Zobair/Pam Olson, Apr. 17, 2009 Re: NBAA meetings |
| DX-33 | Email from Gary Arber to Nina Garvey/Tony Gasaway, Aug. 21, 2009 Re: Catching Up; NBAA |
| DX-34 | Email from Mike Nichols to Tony Gasaway, Dec. 9, 2009 Re: Next Weeks NBAA Tax Committee Meeting |
| DX-36 | Flight Options Management Agreement, Dec. 15, 2004 |
| DX-38 | Flight Options Management Agreement, Oct. 2008 |
| DX-41 | Email from Pam Olson to Talha Zobair, et al., Jan. 20, 2010 Re: Agenda Conference with IRS Appeals |
| DX-42 | Letter from Pam Olson to James Conner/Roger Janosek, Feb. 12, 2010 Re: Litigation Hazards |
| DX-43 | Letter from Pam Olson to James Conner/Roger Janosek, Apr. 7, 2010 Re: FO Appeals Settlement |
| DX-45 | Letter from David Robison to James Conner, Jun. 24, 2010 Re: Request for Mediation |
| DX-48 | Email from Talha Zobair to Nina Garvey, et al., Aug. 16, 2011 Re: IIR tabled pending a CCA |
| DX-49 | Email from Talha Zobair to Gary Arber/Debra Perelman et al., Aug. 17, 2011 Re: Industry FET/State Call |
| DX-50 | Email from Gary Arber to Mike Nichols, Aug. 19, 2011 Re: A Potential Problem |

| DX-51 | Email from Mike Nichols FET Working Group, Nov. 29, 2011 Re: Update on FET Working Group |
| DX-52 | Minutes of NBAA FET Working Group, Dec. 7, 2011 Re: Litigation update and 2011 CCA |
| DX-56 | IRS CCA 201210026 – Mar. 9, 2012 |
| DX-58 | Flight Options Refund Claim for 2004–2007, Dec. 30, 2011 (*Flight Options I*) |
| DX-60 | *Flight Options I* Complaint |
| DX-68 | Flight Options Refund Claim for 2009 – 2012, Sept. 29, 2015 (*Flight Options II*) |
| DX-69 | Flight Options Forms 2848 |
| DX-70 | Flight Options Forms 4340 Certificate of Assessments, Payments, and Other Specified Matters |
| DX-86 | Alpha Flying Marked Complaint |

***Factual Stipulation***

On September 18, 2024, the parties stipulated to the truth of the following fact:

> As reflected in *PlaneSense Inc. f/k/a Alpha Flying, Inc. v. United States*, Docket No.  1:11-cv-00136-PB (Distr. N.H. *filed* March 22, 2011), the audit of PlaneSense, Inc. f/k/a Alpha Flying Inc. (PlaneSense) for tax periods April 1, 2004 through June 30, 2006 was settled pretrial on or around July 30, 2013 whereby the United States conceded one hundred percent (100%) of the FET uncollected on monthly management fees and fuel surcharges, while PlaneSense conceded one hundred percent (100%) of the refund claim for FET collected on variable rate fees.

(Joint Stipulation of Fact, ECF No. 130, PageID# 4469.)